IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:19-CV-106-D

| | | |
|---|---|---|
| PENN NATIONAL SECURITY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| LINKONE SRC, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

On March 15, 2019, Penn National Security Insurance Company ("Penn National" or "plaintiff"), filed a complaint under 28 U.S.C. § 2201 seeking a declaratory judgment against LinkOne SRC, LLC, formerly known as Sun River Service Company, LLC ("LinkOne" or "defendant") [D.E. 1]. On June 20, 2019, LinkOne answered and filed counterclaims under North Carolina law for breach of contract and unfair and deceptive acts [D.E. 12]. On July 11, 2019, Penn National answered LinkOne's counterclaims [D.E. 16].

On September 14, 2020, Penn National moved for summary judgment on its declaratory judgment claim and on LinkOne's unfair and deceptive acts counterclaim [D.E. 34] and filed a memorandum, statement of material facts, and exhibits in support [D.E. 35, 36, 41]. That same day, LinkOne moved for summary judgment on Penn National's declaratory judgment claim and on its breach of contract counterclaim [D.E. 37] and filed a memorandum, statement of material facts, and exhibits in support [D.E. 38, 39, 40]. On October 5, 2020, Penn National responded in opposition to LinkOne's motion for summary judgment [D.E. 43] and responded to LinkOne's statement of material facts [D.E. 44]. That same day, LinkOne responded in opposition to Penn National's motion for summary judgment [D.E. 45], responded to Penn National's statement of material facts [D.E. 46], and filed exhibits in support [D.E. 47]. On October 19, 2020, Penn National replied [D.E.

48] and LinkOne replied [D.E. 49]. As explained below, the court grants LinkOne's motion for summary judgment on its breach of contract claim, denies Penn National's motion for summary judgment on its declaratory relief claim, and denies Penn National's motion for summary judgment on LinkOne's unfair and deceptive acts claim.

I.

LinkOne is a North Carolina limited liability company based in Wilson, North Carolina, that provides fresh and frozen raw meat ingredients to the pet food industry. See Compl. [D.E. 1] ¶ 5; [D.E. 40-6] 4, 8. Penn National is an insurance company and a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania. See Compl. ¶ 4. Penn National conducts business in North Carolina. Id.

On May 15, 2018, Penn National issued LinkOne a commercial general liability policy, policy number CX9 0648125, with effective dates May 15, 2018, to May 15, 2019. See [D.E. 40-1] 3. The policy's Section I, Coverage A states, inter alia, that Penn National will provide up to $1,000,000 in coverage for "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." Id. at 3, 128. The policy defined key terms, provided endorsements for various types of coverage, and excluded certain damages from recovery. See id. at 102, 133, 143–46, 157.

One of LinkOne's principal customers is Mars Petcare U.S., Inc. ("Mars"). See [D.E. 40-6] 9. Mars manufactures pet food in Columbus, Ohio. See [D.E. 40-2] ¶¶ 2–3. Mars's Ohio facility is a "high-volume" pet food manufacturing facility and manufactures approximately 240,000 metric tons of pet food annually. See id. In July 2018, LinkOne regularly shipped its products, including its chicken blend product, to Mars's Ohio facility. See [D.E. 40-6] 9, 12.

In July 2018, a LinkOne employee left a cleaning brush in a tanker truck which LinkOne then filled with LinkOne's chicken blend product and delivered to Mars's Ohio facility. See id. at 23–24, 31; [D.E. 44] ¶¶ 25, 27–28. On July 22 and 24, 2018, Mars discovered pieces of this brush in the

2

Mars production line during routine checks of equipment, ingredients, and mixed goods. See [D.E. 40-2] ¶ 5. Because of the contamination, Mars shut down its production line for cleaning, and had to destroy and dispose of its contaminated raw ingredients and finished products. See id. ¶¶ 7–16; [D.E. 40-3] 1–2. As a result, Mars suffered losses related to raw ingredients, finished products, labor charges, plant downtime costs, and disposal fees totaling $1,068,602.78. See [D.E. 40-2] ¶¶ 7–19; [D.E. 40-3] 1–2. Of those losses, $65,402.48 were for loss of LinkOne's "Chicken Blend Fresh." [D.E. 40-3] 2.

Mars determined that the brush contamination came from LinkOne's July 2018 chicken blend delivery and informed LinkOne of its damages. See [D.E. 40-2] ¶ 5. On August 22, 2018, LinkOne notified Penn National of the contamination incident and of Mars's claim and sought indemnification under the commercial general liability policy. See [D.E. 40-5] 5. Penn National initiated an investigation of the claim and notified LinkOne that it reserved all rights under the parties' commercial general liability policy. See [D.E. 36-1] 83; [D.E. 36-16] 7.

During the investigation, LinkOne provided Penn National with documentation of Mars's damages claims. In October 2018, Penn National determined that it required further documents from Mars to substantiate those claims. See [D.E. 47-2] 8–10, 20–23, 68–69; [D.E. 47-4] 1–2. Penn National halted its investigation and requested documents from Mars. See id. Mars agreed to provide the documents as long as Penn National agreed to sign a non-disclosure agreement to protect Mars's confidential information. See [D.E. 40-2] ¶¶ 21–25. Without consulting counsel, Penn National refused to sign the non-disclosure agreement, declined to investigate LinkOne's claim any further, and declined to review documents from Mars. See [D.E. 47-2] 40–42; [D.E. 47-3] 28–29

On November 30, 2018, Mars notified LinkOne that it would pursue legal action unless LinkOne paid Mars damages for the July 2018 contamination incident. See [D.E. 40-6] 29–30. To avoid litigation, LinkOne promised to pay Mars $750,000. See id. at 28. As of December 11, 2018, however, Penn National had not reached a coverage determination. See [D.E. 40-5] 18–20.

3

Nonetheless, Penn National approved LinkOne's $750,000 payment to Mars. See id. at 20. LinkOne signed a settlement agreement with Mars and made this payment to Mars on December 13, 2018. See [D.E. 40-4] ¶ 10; [D.E. 47-3] 32.

On March 15, 2019, Penn National sent LinkOne a letter denying coverage for the majority of LinkOne's claim. See [D.E. 40-10]. In the letter, Penn National recited the policy's coverage and exclusionary provisions and stated that it was denying coverage because LinkOne's "claimed damages are not due to 'property damage'" as defined in the policy and because "the product recall exclusion and exclusion to property not physically injured preclude coverage for the claimed damages." Id. at 2–3. Notwithstanding its denial of coverage for LinkOne's other damages, Penn National offered to pay the $33,122.87 for the costs associated with Mars's plant downtime costs, but provided no explanation for why it believed that amount "may be afforded coverage." Id. at 3. As a condition of making the $33,122.87 payment, Penn National required LinkOne to release Penn National of any and all claims. See [D.E. 47-3] 35. LinkOne refused Penn National's offer. Penn National filed this action the same day. See [D.E. 1].

On May 23, 2019, LinkOne issued Mars a payment for $318,602.78, bringing LinkOne's total payments to Mars to $1,068,602.78. See [D.E. 40-4] ¶ 11. After the payment, Mars released LinkOne from all claims concerning the contamination incident. See [D.E. 40-2] ¶ 26.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials

4

in its pleading, see Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248; Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

This court has subject-matter jurisdiction based on diversity. See 28 U.S.C. § 1332. Thus, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002).

The dispute requires this court to apply North Carolina law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS

5

Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A.

LinkOne moves for summary judgment on its breach of contract claim alleging that Penn National breached the commercial general liability policy by not providing coverage for LinkOne's damages claim. Penn National opposes LinkOne's motion and moves for summary judgment on PennNational's claim seeking declaratory relief that the commercial general liability policy does not provide coverage for LinkOne's claim.

Under North Carolina law, a breach of contract claim involves two elements: (1) the existence of a valid contract and (2) breach of the terms of that contract. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A breach of a contract occurs where there is "[n]on-performance[,] . . . unless the person charged . . . shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Cater v. Barker, 172 N.C. App. 441, 447, 617 S.E.2d 113, 117 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006) (quotation omitted); see Abbington SPE, LLC v. U.S.

6

Bank, Nat'l Ass'n, 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished). An insurance policy is a contract, and the policy's provisions govern the rights and duties of the contracting parties. See Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000); C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co., 326 N.C. 133, 142, 388 S.E.2d 557, 562 (1990). The insured party "has the burden of bringing itself within the insuring language of the policy." Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 606, 630 S.E.2d 221, 229 (2006) (quotation omitted). "Once it has been determined that the insuring language embraces the particular claim or injury, the burden then shifts to the insurer to prove that a policy exclusion excepts the particular injury from coverage." Id., 630 S.E.2d at 229; see Fortune Ins. Co. v. Owens, 351 N.C. 424, 430, 526 S.E.2d 463, 467 (2000); Nationwide Mut. Fire Ins. Co. v. Allen, 68 N.C. App. 184, 188, 314 S.E.2d 552, 554 (1984).

Under North Carolina law, interpreting a written insurance contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). "Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Gaston Cnty., 351 N.C. at 299, 524 S.E.2d at 563 (quotation omitted); see Plum Props., LLC v. N.C. Farm Bureau Mut. Ins. Co., 254 N.C. App. 741, 744, 802 S.E.2d 173, 175 (2017); Mizell, 138 N.C. App. at 532–33, 530 S.E.2d at 95. When interpreting a written insurance policy under North Carolina law, "the goal of construction is to arrive at the intent of the parties when the policy was issued." Gaston Cnty., 351 N.C. at 299, 524 S.E.2d at 563 (quotation omitted); see Stewart Eng'g, Inc. v. Cont'l Cas. Co., No. 5:15-CV-377-D, 2018 WL 1403612, at *3–4 (E.D.N.C. Mar. 20, 2018) (unpublished), aff'd, 751 F. App'x 392 (4th Cir. 2018) (per curiam) (unpublished); Plum Props., 254 N.C. App. at 744, 802 S.E.2d at 175. Moreover, when interpreting

7

a written insurance policy under North Carolina law, courts construe ambiguous coverage clauses broadly and ambiguous exclusionary clauses narrowly. See Plum Props., 254 N.C. App. at 744–45, 802 S.E.2d at 175–76; see Patrick v. Wake Cnty. Dep't of Hum. Servs., 188 N.C. App. 592, 596, 655 S.E.2d 920, 924 (2008).

A court may engage in judicial construction only when the language used in the policy is ambiguous. See Mizell, 138 N.C. App. at 532, 530 S.E.2d at 95. Under North Carolina law, courts construe ambiguities against the insurer and in favor of the insured. See id., 530 S.E.2d at 95. Language is not ambiguous, however, "simply because the parties contend for differing meanings to be given to the language." Id., 530 S.E.2d at 95. Rather, an ambiguity exists if the policy's language is "fairly and reasonably susceptible to either of the constructions for which the parties contend." Blis Day Spa, LLC v. Hartford Ins. Grp., 427 F. Supp. 2d 621, 630 (W.D.N.C. 2006) (quotation omitted); see Westchester Surplus Lines Ins. Co. v. Clancy & Theys Constr. Co., No. 5:12-CV-636-BO, 2014 WL 2157442, at *3 (E.D.N.C. May 23, 2014) (unpublished), aff'd in part, 683 F. App'x 259 (4th Cir. 2017) (unpublished).

The parties contest whether LinkOne's damages claim is covered by the commercial general liability policy's property damage coverage provision. See [D.E. 35] 7–13; [D.E. 38] 8–11. LinkOne argues that Penn National improperly denied coverage where LinkOne caused "property damage" to Mars's ingredients, finished goods, and production line. See [D.E. 38] 8–11. Penn National opposes LinkOne's claim and argues that summary judgment is appropriate on its claim for declaratory relief because LinkOne has presented no evidence that shows damage to any product other than LinkOne's own. See [D.E. 35] 7–9. Thus, Penn National asserts that LinkOne has not brought itself within the insuring language of the policy and the policy provides no coverage for LinkOne's claim. Alternatively, Penn National argues that the commercial general liability policy's exclusions preclude coverage. See id. at 9–13; [D.E. 48] 6–7.

The parties dispute whether the insuring language of the commercial general liability policy covers LinkOne's claim. LinkOne argues that the damages Mars incurred are property damages as well as damages "because of" property damage within the meaning of the policy. See [D.E. 38] 10–11; [D.E. 45] 10; [D.E. 49] 4. Penn National responds that LinkOne's alleged damages are not property damage as defined by the policy and that LinkOne has failed to present sufficient evidence to demonstrate that Mars's damages were caused by LinkOne's contaminated product. See [D.E. 35] 7–9; [D.E. 43] 7–11; [D.E. 48] 6.

The court begins with the policy's language. The commercial general liability policy provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." [D.E. 40-1] 128. The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . or [l]oss of use of tangible property that is not physically injured." Id. at 145.[1]

_____

[1] The policy also states that "[t]his insurance applies to . . . 'property damage' only if . . . [the] 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . [and] occurs during the policy period[.]" [D.E. 40-1] 128. Penn National concedes that LinkOne's claim was due to an "occurrence" that took place in the "coverage territory" and during the "policy period." See [D.E. 35, 43, 48]. The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [D.E. 40-1] 144. The policy also defines "coverage territory" to include the United States of America. Id. at 142. The commercial general liability policy's period ran from May 15, 2018, to May 15, 2019. See id. at 3. The parties do not contest these coverage requirements. LinkOne's employee negligently left the cleaning brush in the tanker truck, unintentionally contaminating LinkOne's product before LinkOne shipped LinkOne's product to Mars's Ohio facility. See, e.g., [D.E. 40-7] 5–8. This incident meets the definition of an "accident," see Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 694, 340 S.E.2d 374, 379 (1986), and, therefore, satisfies the policy's definition of "occurrence" where the policy does not otherwise define the term "accident." See [D.E. 40-1] 144. Additionally, the alleged property damage occurred in July 2018, during the policy period, and at Mars's Ohio facility, which is in the covered territory. See id. at 3, 142; [D.E. 40-2] ¶ 5; [D.E. 40-7] 5–8.

The commercial general liability policy does not define "physical injury," "tangible property," or "loss of use." Thus, the court gives those non-technical terms their ordinary meaning. See Gaston Cnty., 351 N.C. at 299, 524 S.E.2d at 563. The term "physical injury" means any harm or damage done to property, including contamination of that property. See id. at 302–03, 524 S.E.2d at 564–65; C.D. Spangler, 326 N.C. at 146, 388 S.E.2d at 565; Erie Ins. Exch. v. Builders Mut. Ins. Co., 227 N.C. App. 238, 246, 742 S.E.2d 803, 810–11 (2013); Injury, Black's Law Dictionary (11th ed. 2019). "Tangible property" means property "having physical substance apparent to the senses," and includes items such as manufacturing facilities and goods and ingredients used in manufacturing. Am. Online, Inc. v. St. Paul Mercury Ins. Co., 347 F.3d 89, 95 (4th Cir. 2003) (quotation omitted); see Gaston Cnty., 351 N.C. at 302–03, 524 S.E.2d at 564–65 (describing as tangible property a pressure vessel used in dye manufacturing as well as finished dye products and ingredients used in dye manufacturing); Property, Black's Law Dictionary (11th ed. 2019) (defining tangible property as "[p]roperty that has physical form and characteristics" as opposed to intangible property which "lacks a physical existence" and includes items such as "stock options and business goodwill"). "Loss of use" means that property is unable to be employed to accomplish its usual purpose. See Use, Black's Law Dictionary (11th ed. 2019); see also Gaston Cnty., 351 N.C. at 302, 524 S.E.2d at 564 (using Black's Law Dictionary to define the ordinary meaning of an insurance policy's undefined terms).

Even viewing the evidence in a light most favorable to Penn National, LinkOne's claim is one for physical injury to tangible property and for the loss of use of tangible property not physically injured. In July 2018, a LinkOne employee left a cleaning brush in a tanker truck which LinkOne then filled with LinkOne's "Chicken Blend Fresh" product and delivered to Mars's Ohio facility. See [D.E. 40-6] 23–24, 31; [D.E. 44] ¶¶ 25, 27–28. Thereafter, LinkOne's product contaminated Mars's raw ingredients and finished goods, causing a physical injury to Mars's tangible property. See [D.E. 40-2] ¶¶ 5–16; Gaston Cnty., 351 N.C. at 302–03, 524 S.E.2d at 564–65; C.D. Spangler,

10

326 N.C. at 146, 388 S.E.2d at 565. LinkOne's contaminated product also caused Mars to shut down its manufacturing facility for cleaning, preventing Mars's equipment from being employed to manufacture pet food, causing a loss of use of Mars's tangible property. Accordingly, LinkOne's claim is for property damage within the commercial general liability policy's insuring language. See [D.E. 40-1] 128.

In opposition, Penn National argues that LinkOne's evidence only supports a claim for damage to its own property which the policy does not cover. See [D.E. 35] 7–9; [D.E. 43] 5–6, 9–11; [D.E. 48] 2–4. The parties agree that LinkOne cannot recover under the policy for damages to its own product, including the $65,402.48 in property damage to LinkOne's "Chicken Blend Fresh." See [D.E. 40-3] 2; [D.E. 43] 5; [D.E. 49] 2 & n.1. Penn National, however, attempts to take this argument a step too far by claiming that Mars's incorporation of LinkOne's contaminated product into its ingredients and finished goods rendered Mars's ingredients and finished goods LinkOne's products, thereby excluding claims for damages to them from the policy's property damage coverage.

In support, Penn National cites Wisconsin Pharmacal Co. v. Nebraska Cultures of California, Inc., 367 Wis. 2d 221, 876 N.W.2d 72 (2016). See [D.E. 43] 7–8. In Wisconsin Pharmacal, the Supreme Court of Wisconsin addressed whether an ingredient supplier's insurance policy's property-damage provision provided coverage for damages caused when the supplier provided the wrong bacteria to a third-party for use in manufacturing a daily probiotic supplement. See Wis. Pharmacal Co., 367 Wis. 2d at 231–33, 876 N.W.2d at 76–77. The manufacturer sued the supplier and the supplier's insurance provider. In determining whether the insurance policy's property damage provision provided coverage, the Supreme Court of Wisconsin applied Wisconsin law and held that "combining a defective ingredient with other ingredients and incorporating them into supplement tablets[] formed an integrated system." Id. at 244, 876 N.W.2d at 82. The court then reasoned that "damage by a defective component of an integrated system to either the system as a

11

whole or other system components is not damage to 'other property.'" Id. at 241, 876 N.W.2d at 80–81 (alteration and quotation omitted). Thus, the court held that the supplier's damages claim did not fall within the policy's property damage coverage. See id. at 262, 876 N.W.2d at 91.

Wisconsin Pharmacal is not controlling precedent or persuasive authority in light of North Carolina law. See, e.g., Builders Mut. Ins. Co. v. Mitchell, 210 N.C. App. 657, 709 S.E.2d 528 (2011). In Builders Mutual, the North Carolina Court of Appeals addressed whether a contractor's commercial general liability policy covered damages to a home caused by the installation of faulty gutters. See id. at 662–63, 709 S.E.2d at 532–33. The court reasoned that property damage provisions provided coverage because "the property damaged," i.e., the home, "was previously undamaged and was not part of the [claimant's] work product [itself]," i.e., the gutters. Id. at 661–63, 709 S.E.2d at 532–33; see Prod. Sys., Inc. v. Amerisure Ins. Co., 167 N.C. App. 601, 606–07, 605 S.E.2d 663, 666–67 (2004). As in Builders Mutual, Mars's ingredients and products, which were not part of LinkOne's work product, were undamaged until mixed with LinkOne's contaminated product. Accordingly, the court predicts that the Supreme Court of North Carolina would hold that the commercial general liability policy's property damage provision provides coverage for Mars's property damages, and rejects Penn National's contrary argument. See Toloczko, 728 F.3d at 398; Twin City Fire Ins. Co., 433 F.3d at 369.[2]

_____

[2] Penn National also argues that LinkOne cannot recover under the policy's property damage provision because North Carolina law recognizes that liability insurance policies are not performance bonds and do not provide coverage for claims arising out of the failure of insured's product or work to meet the quality or specifications for which the insured may be liable as a matter of contract. See [D.E. 35] 8–9. In support, Penn National cites Barbee v. Harford Mutual Insurance Co., 330 N.C. 100, 408 S.E.2d 840 (1991), and Western World Insurance Co. v. Carrington, 90 N.C. App. 520, 369 S.E.2d 128 (1988). Penn National's argument fails because the damages for which LinkOne seeks coverage are damages to Mars's property, not LinkOne's own product. See W. World, 90 N.C. App. at 524, 369 S.E.2d at 130–31 (holding that the property damage provision did not provide coverage because "[t]he damages sought are solely for bringing the quality of the insured's work up to the standard bargained for," and were not "damages claimed . . . for damage to property other than that of the insured, which was caused either by the defective work or product, or the need to repair or replace that work or product."); see also Barbee, 330 N.C. at 102–04, 408 S.E.2d at 841–42

Penn National also argues that the evidence is insufficient to demonstrate that LinkOne's contaminated product caused Mars's claimed damages. LinkOne, however, has presented the sworn declaration of Gary Nicholson ("Nicholson"), the Site Director at Mars's Ohio facility in July 2018. See [D.E. 40-2]. Nicholson states that the brush contaminate "came from a load of raw ingredient (fresh chicken blend) that was delivered to Mars from [LinkOne]." Id. ¶ 5. Nicholson also states that he is "personally familiar" with the damages that Mars suffered as a result of the brush contamination incident and that those damages are accurately captured by "Wright Exhibit 16," a spreadsheet describing Mars's damages that "pertain solely to work that was required or loss that occurred as a result of the July 2018 contamination incident." Id. ¶¶ 8–19 ("Wright Exhibit 16" is cited as [D.E. 40-3]). Penn National has presented no evidence contradicting Nicholson's statements or Wright Exhibit 16, and its speculation does not suffice to defeat summary judgment. See, e.g., Beale, 769 F.2d at 214. Even viewing the evidence in a light most favorable to Penn National, no rational jury could find that LinkOne has failed to meet its burden to "bring[] itself within the insuring language of the policy." Nelson, 177 N.C. App. at 606, 630 S.E.2d at 229 (quotation omitted). Accordingly, the burden shifts to Penn National to prove that a policy exclusion applies. See Fortune Ins. Co., 351 N.C. at 430, 526 S.E.2d at 467.

ii.

Penn National argues that, even if the policy's property damage provision provides coverage for LinkOne's claim, the policy's exclusions except LinkOne's damages claim from coverage. Specifically, Penn National argues that the commercial general liability policy's "product recall" and "Impaired Property or Property Not Physically Injured" exclusions apply to LinkOne's claim. See [D.E. 35] 9–10; [D.E. 43] 12–13; [D.E. 48] 6–7. LinkOne disagrees. See [D.E. 38] 18–20; [D.E. 45] 15–16; [D.E. 49] 6–7.

---

(deciding the case under the insurance policy's "faulty work" exclusion, not the general principles governing property damage provisions).

13

The policy's product recall exclusion provides:

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";
(2) "Your work"; or
(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

[D.E. 40-1] 133. The policy defines "your product" as:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;
(b) Others trading under your name; or
(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

Id. at 146. The policy's definition of "your work" provides that the phrase:

a. Means:

(1) Work or operations, performed by you or on your behalf; and
(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
(2) The providing of or failure to provide warnings or instructions.

Id. at 146. The policy defines "impaired property" as:

[T]angible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

14

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Id. at 143.

Penn National fails to meet its burden to show that the product recall exclusion applies. Viewing the evidence in a light most favorable to Penn National, LinkOne's claim does not seek indemnification for damages "for loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of" "your product" or "your work." Instead, LinkOne's claimed damages are for damages to Mars's property suffered because of the brush contamination. The claimed damages include losses concerning Mars's raw ingredients, finished products, and the loss of use of Mars's production line. See [D.E. 40-3] 1–2. The claimed damages are not for "goods or products . . . manufactured, sold, handled, distributed or disposed of by" LinkOne, others trading under LinkOne's name, or a person or organization whose business or assets LinkOne acquired. Cf. [D.E. 40-1] 133, 146. Additionally, the claimed damages are not for "[w]ork or operations, performed by [LinkOne] or on [LinkOne's] behalf" or for "[m]aterials, parts or equipment furnished in connection with [LinkOne's] work or operations." Id. at 146.

Likewise, the claimed damages are not for "impaired property." The policy's definition of impaired property requires that the property "can be restored to use by the repair, replacement, adjustment or removal of '[LinkOne's] product' or '[LinkOne's] work.'" Id. at 143. Mars's damaged ingredients and finished products for which LinkOne seeks indemnification were destroyed and disposed of and cannot be restored to use. See [D.E. 40-2] ¶¶ 7–19; [D.E. 40-3] 1–2. As for Mars's loss of use of its production line, neither LinkOne's product nor its work was incorporated into Mars's production line, and neither party argues that LinkOne breached its contract with Mars. Cf. [D.E. 40-1] 143; see also Rodgers Builders, Inc. v. Lexington Ins. Co., No. 3:15-cv-00110-MOC-DSC, 2016 WL 1052623, at *10 (W.D.N.C. Mar. 11, 2016) (unpublished). Accordingly, no rational

15

jury could conclude that the claimed damages are excluded under the policy's product recall exclusion.[3]

Penn National also argues that LinkOne's damages are excluded under the policy's "impaired property or property not physically injured" exclusion. See [D.E. 43] 12–13; [D.E. 48] 6–7. Specifically, Penn National argues that LinkOne has failed to present evidence that each and every ingredient, finished product, or portion of the production line for which LinkOne seeks damages was damaged by LinkOne's product. See [D.E. 43] 12–13; [D.E. 48] 6–7 (claiming that the damages are excluded, for instance, because the Mars products LinkOne lists in its claim do not "on their face" contain LinkOne's contaminated product: "Chicken Blend Fresh").

The impaired property exclusion is separate from the product recall exclusion and provides:

**m. Damage To Impaired Property Or Property Not Physically Injured**

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

[D.E. 40-1] 133. To prove the exclusion applies, Penn National must show that LinkOne's claimed damages are for property damage to "impaired property" or property "not physically injured" by

---

[3] Penn National also argues that even if the policy provides coverage for LinkOne's claim, that the policy's "Product Recall Expense Coverage" and "Pennpac Plus" endorsements limit that coverage. See [D.E. 35] 10–13. Under the contract's plain language, however, both endorsements fail to limit Section I, Coverage A, the coverage under which LinkOne seeks recovery. Rather, both endorsements add additional coverages separate and apart from Coverage A. See [D.E. 40-1] 102, 157 (indicating that both endorsements are "added to **Section I - Coverages**" and not "added to **Section I - Coverages, Coverage A,**" the language the policy uses when it applies endorsements to Coverage A). Thus, the Product Recall Expense Coverage and Penn Plus endorsements do not limit LinkOne's recovery for damages claimed under Coverage A.

LinkOne's product, work, or LinkOne's delay or failure to fulfill its contract with Mars.

Penn National has not met its burden to show that the impaired property exclusion applies. Viewing the evidence in a light most favorable to Penn National, no rational jury could find that LinkOne's claim is one for damages to impaired property. Specifically, Mars's damages are not to property that "can be restored to use by the repair, replacement, adjustment or removal of" LinkOne's product or work or due to LinkOne's failure to fulfill its contract with Mars. Additionally, Penn National has presented no evidence to rebut LinkOne's evidence—including the Nicholson declaration and Wright Exhibit 16—indicating that LinkOne's brush-contaminated product physically injured Mars's ingredients, finished goods, and production line. See [D.E. 40-2] ¶¶ 7–19; [D.E. 40-3] 1–2. Penn National's contrary speculation does not suffice. See Beale, 769 F.2d at 214. Accordingly, no rational jury could find that the impaired property exclusion applies.

iii

LinkOne has satisfied its burden to bring itself within the insuring language of the commercial general liability policy. Penn National has failed to show that any policy exclusion applies. Thus, even viewing the record in a light most favorable to Penn National, Penn National breached the policy by failing to indemnify LinkOne for its damages claim. See, e.g., McLamb, 173 N.C. App. at 588, 619 S.E.2d at 580; Poor, 138 N.C. App. at 26, 530 S.E.2d at 843. Accordingly, the court denies Penn National's motion for summary judgment on it declaratory relief claim and grants LinkOne's motion for summary judgment on its breach of contract claim.

As for damages, "[a] party injured by a breach of contract is entitled to be placed in the same position he would have occupied if the contract had been performed, insofar as this can be done by an award of money damages." Hassett v. Dixie Furniture Co., 333 N.C. 307, 312–13, 425 S.E.2d 683, 685 (1993); see Perfecting Serv. Co. v. Prod. Dev. & Sales Co., 259 N.C. 400, 415, 131 S.E.2d 9, 21 (1963); Pleasant Valley Promenade v. Lechmere, Inc., 650 N.C. App. 650, 665, 464 S.E.2d 47, 59 (1995). LinkOne's evidence substantiates its claim for $1,003,200.30, an amount exceeding the

parties' commercial general liability coverage limit of $1,000,000.00.[4]  Accordingly, the court

awards LinkOne $1,000,000 in damages, the amount that Penn National should have paid under the

contract.

## B.

Penn National also moves for summary judgment on LinkOne's unfair and deceptive acts

claim. North Carolina's unfair claims settlement practices act provides:

> (11) Unfair Claim Settlement Practices.—Committing or performing with such
> frequency as to indicate a general business practice of any of the following:
> Provided, however, that no violation of this subsection shall of itself create any cause
> of action in favor of any person other than the Commissioner:
>
> . . . .
>
> > c. Failing to adopt and implement reasonable standards for the prompt
> > investigation of claims arising under insurance policies;
> >
> > d. Refusing to pay claims without conducting a reasonable investigation based
> > upon all available information;
> >
> > . . . .
> >
> > f. Not attempting in good faith to effectuate prompt, fair and equitable
> > settlements of claims in which liability has become reasonably clear;
> >
> > . . . .

---

[4] LinkOne is entitled to damages under Coverage A, which contains the policy's property damage provision. This provision not only covers damages to Mars's ingredients, finished products, and loss of use of its production line, but also for consequential damages. Beyond damages to its tangible property, Mars's consequential damages included costs associated with labor charges and disposal fees. See [D.E. 40-3] 1–2. Under the terms of the commercial general liability policy and under North Carolina law, it is appropriate to include these consequential damages as damages incurred "because of . . . 'property damage[.]'" See [D.E. 40-1] 128, 142–146 (including no definition of "damages"); see, e.g., C.D. Spangler, 326 N.C. at 151–52, 388 S.E.2d at 568–69 (holding that the term damages, when undefined in an insurance policy, must be construed in favor of the policyholder and includes costs for cleaning up contamination associated with an occurrence causing property damage); see also 12 Couch on Ins. § 172:28 (3d ed. 2020) ("[I]t has been stated that a construction that excludes consequential losses from coverage under a general liability policy is not a reasonable interpretation of a policy which insures against all damages because of property damage, nor is it one which comports with reasonable expectation of average lay purchaser of insurance as to coverage afforded by policy.").

h. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled;

. . . .

m. Failing to promptly settle claims where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; and

n. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

N.C. Gen. Stat. § 58-63-15(11).

Although N.C. Gen. Stat. § 58-63-15(11) does not include a private cause of action, a plaintiff may obtain relief for violations of N.C. Gen. Stat. § 58-63-15(11) under N.C. Gen. Stat. § 75-1.1 ("UDTPA"). See, e.g., Elliott v. Am. States Ins. Co., 883 F.3d 384, 396 (4th Cir. 2018) ("[T]he remedy for a violation of section 58-63-15 is the filing of a section 75-1.1 claim." (quotation omitted)); Burch v. Lititz Mut. Ins. Co., No. 7:12–CV–107–FL, 2013 WL 6080191, at *8–9 (E.D.N.C. Nov. 19, 2013) (unpublished). In order to establish a prima facie case under the UDTPA, a plaintiff must show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000); see N.C. Gen. Stat. § 75-1.1; Kelly v. Ga.-Pac. LLC, 671 F. Supp. 2d 785, 798–99 (E.D.N.C. 2009) (collecting cases). "[W]hether an act or practice is an unfair or deceptive practice . . . is a question of law for the court." Gray, 352 N.C. at 68, 529 S.E.2d at 681. Conduct that violates N.C. Gen. Stat. § 58-63-15(11) is an unfair and deceptive act or practice under the UDTPA because "such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers." Id. at 71, 529 S.E.2d at 683; see Country Club of Johnston Cnty., Inc. v. U.S. Fid. & Guar. Co., 150 N.C. App. 231, 246, 563 S.E.2d 269, 279 (2002). Moreover, although N.C. Gen. Stat. § 58-63-15(11) requires a showing of a "frequency indicating a 'general business practice,'" a claim brought under the UDTPA does not require a frequency showing. Gray, 352 N.C. at 71, 529

19

S.E.2d at 683; see Westchester Fire Ins. Co. v. Johnson, 221 F. Supp. 2d 637, 643–44 (M.D.N.C. 2002). Thus, N.C. Gen. Stat. § 58-63-15(11) provides "examples of conduct [supporting] a finding of unfair or deceptive acts or practices." Johnson, 221 F. Supp. 2d at 644 (quotation omitted).

Penn National argues that the evidence shows that Penn National properly and fairly handled LinkOne's claim and expeditiously pursued a declaratory judgment action to ensure that the parties' respective rights were adjudicated. See [D.E. 35] 14–16; [D.E. 48] 8. LinkOne responds that it has presented evidence from which a rational jury could find that Penn National violated the UDTPA. See [D.E. 45] 19–27.[5]

Viewing the record in a light most favorable to LinkOne, Penn National is not entitled to summary judgment on LinkOne's UDTPA claim. LinkOne submitted its claim to Penn National in August 2018, but Penn National halted its investigation into LinkOne's claims in October 2018 because Mars required Penn National to sign non-disclosure agreements before it would provide Penn National with documents and information it needed to evaluate LinkOne's claims. See [D.E. 40-2] ¶¶ 21–25; [D.E. 40-5] 5; [D.E. 47-2] 8–10, 20–23, 68–69; [D.E. 47-3] 6–7; [D.E. 47-4]. Penn National did not consult with counsel about the non-disclosure agreements, but continued to use potential legal issues associated with Mars's non-disclosure agreement requirement as an excuse to not investigate further. See [D.E. 47-2] 20–23, 40–42, 68–69; [D.E. 47-3] 28–29. LinkOne's evidence also shows that Penn National offered LinkOne $33,122.87 for the plant downtime portion of its claim, but required as a condition for payment that LinkOne release Penn National from all other claims. See [D.E. 40-10] 1–3; [D.E. 47-3] 35–36. Additionally, although Penn National had

_____

[5] Penn National does not argue that LinkOne has failed to show that Penn National's insurance activities and practices are "in and affecting commerce" or that they "proximately caused injury" to LinkOne. See [D.E. 35, 48]; see also N.C. Gen. Stat. § 75-1.1(b); Pearce v. Am. Def. Life Ins. Co., 316 N.C. 461, 469, 343 S.E.2d 174, 179 (1986) ("The business of insurance is unquestionably in commerce[.]" (quotation omitted)); Vazquez v. Allstate Ins. Co., 137 N.C. App. 741, 744–45, 529 S.E.2d 480, 482 (2000) (holding that a plaintiff suffers an injury when an insurance company wrongfully delays payment of moneys owed under the policy).

20

all the information necessary to make a settlement offer regarding Mars's plant downtime damages in October 2018, Penn National waited until March 2019 to make its settlement offer. See [D.E. 40-10] 1–3; [D.E. 47-2] 9–10, 68. Moreover, Penn National's March 2019 settlement offer did not explain why the plant downtime damages were covered but the other claimed damages were not. See [D.E. 40-10] 1–3.

Viewing the evidence in the light most favorable to LinkOne, a rational jury could find that Penn National violated N.C. Gen. Stat. § 58-63-15(11) and, therefore, violated N.C. Gen. Stat. § 75-1.1. See N.C. Gen. Stat. §§ 58-63-15(11), 75-1.1; Gray, 352 N.C. at 71, 529 S.E.2d at 683. Accordingly, the court denies Penn National's motion for summary judgment on LinkOne's UDTPA claim.

III.

In sum, the court DENIES plaintiff's motion for summary judgment [D.E. 34], GRANTS defendant's motion for summary judgment [D.E. 37], and AWARDS defendant $1,000,000 on defendant's breach of contract counterclaim. Interest shall accrue at the legal rate. The court DENIES plaintiff's motion for summary judgment on defendant's UDTPA counterclaim. The parties shall engage in a court-hosted settlement conference with Magistrate Judge James E. Gates. If the case fails to settle, the court will schedule a trial on the UDTPA claim.

SO ORDERED. This _8_ day of June 2021.

JAMES C. DEVER III
United States District Judge